## MOHAWK RUBBER CO. OF NEW YORK, Inc., v. MUNNELL et al.

(Circuit Court of Appeals, Ninth Circuit. April 7, 1924. Supplemental Opinion, June 9, 1924.)

### No. 4122.

1. **Principal and agent** ⊜⟞123(1)—**Defendants held charged with knowledge of limitation of authority of plaintiff's agent.**

Evidence *held* to show that defendants were charged with knowledge that plaintiff's agent, with whom they claimed to have made an arrangement to return merchandise in reduction of their indebtedness, was without authority to make such arrangement, except subject to approval of his principal.

#### Supplemental Opinion.

2. **Principal and agent** ⊜⟞172—**Ratification of agreement by agent held binding on principal.**

Where a principal, after notice, ratified an agreement as to certain items or matters made by its agent, and so notified the other party thereto, it ratified the agreement as made as to such items and carried into effect, and not with reservations.

In Error to the District Court of the United States for the District of Oregon; Robert S. Bean, Judge.

Action at law by the Mohawk Rubber Company of New York, Inc., against Edgar J. Munnell and Arthur J. Sherrill, individually and as partners doing business as Munnell & Sherrill. Judgment for defendants, and plaintiff brings error. Reversed and remanded.

Beach & Simon and S. J. Bischoff, all of Portland, Or., for plaintiff in error.

Cake & Cake and L. A. Liljeqvist, all of Portland, Or., for defendants in error.

Before GILBERT, HUNT, and RUDKIN, Circuit Judges.

HUNT, Circuit Judge.. This is an action by the Mohawk Rubber Company, tire manufacturers, against defendants, dealers in automobile tires and accessories, to recover upon three promissory notes, each for $2,633, made in December, 1920, and due in February, April, and May, 1921, respectively; also to recover a balance of $6,733 upon an open account for merchandise. Defendants admitted execution of the notes and that the merchandise had been sold, and pleaded that there was an agreement for unlimited protection against price decline in tires and for credits; that an exclusive tire agency for Oregon held by defendants was given by plaintiff to another concern, the American Tire & Rubber Company, and that at plaintiff's request and with its consent the stock of tires, valued at $9,800, held by defendants, was turned over to the American Tire & Rubber Company; that the tires turned over, together with a rebate of $250 on a market decline of November, 1921, was to be credited upon the notes described in certain of the causes of action and upon the open account stated; and that the only balance due by defendants to plaintiff was $387, which defendants tendered. Verdict and judgment were entered in favor of the defendants.

⊜⟞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

[1] Plaintiff does not deny that one Fitzgerald was its agent and Pacific Coast manager, but asserts that he had no authority to enter into the agreements which defendants rely upon, and contends that the evidence shows that he had no such authority. If this contention is sound, then the court was in error in not granting plaintiff's motion for a directed verdict, and the judgment should be reversed.

It would serve no purpose to detail the testimony. It shows that from a time before 1920 the plaintiff and defendants had business relations concerning the distribution and sale of tires, and in 1920 defendants were overstocked and owed plaintiff over $20,000. A special arrangement was then made whereby defendants could return to plaintiff about $6,500 worth of merchandise, and for the balance due five promissory notes, of $2,633 each, were delivered, payable in February, March, April, May, and June, respectively, 1921. Subsequent to this adjustment defendants bought more merchandise, over $11,000 worth, on an open account. Two of the above-mentioned five notes were paid, and by means of credits allowed to the defendants approximately $5,000 was credited on the open account, thus leaving defendants indebted to plaintiff upon the three notes and a balance upon the open account of about $6,700.

We regard the written communications put in evidence, when considered with the oral testimony, as conclusively showing that, except by special authorization, the authority of Fitzgerald was limited, and that he had no power to permit a return of merchandise, or to relieve defendants of liability for the purchase price of merchandise sold and delivered by plaintiff to defendants, and that such limitation of Fitzgerald's authority was thoroughly well known to the defendants when, in November, 1920, the arrangements between the parties were made. Among the items of evidence in support of our conclusion we mention a letter dated May 10, 1921, wherein plaintiff advised defendants of a decline in price, and that prices would be adjusted back to May 2d, price guaranty to cover goods on hand and unsold, and bought during March and April, and also upon a portion of dating orders. There is also a letter of June 2, 1921, from Fitzgerald to defendants, wherein he informed defendants that they must understand that there could be no rebate on stock, regardless of the date it was purchased.

It also appears that prior to March 15, 1920, defendants tried to make an arrangement with Fitzgerald whereby they could purchase merchandise at a price previously prevailing, and Fitzgerald evidently agreed to accept the order on those terms. But, however that may be, in a letter written by Fitzgerald to defendants on March 15, 1920, he told them that on making such terms he had acted without authority from the factory, but believed, if the circumstances had been placed before the factory, possibly they would have assented to the agreement he had promised. He added that on March 6th the factory advised him not to accept any more business at the old figure. That defendants understood the relationship of Fitzgerald to his principal is also evidenced by their letter to Fitzgerald, dated March 19, 1920, asking him to "go to bat" for them, to the end that they might receive assistance from the factory, and by the reply of March 23, 1920, in which Fitzgerald wrote that where considerable money was involved, it was neces-

sary for him to confer with the factory before committing himself. There was also a letter, dated October 21, 1920, in which the plaintiff company directly advised defendants that, as far as price guaranty was concerned, the company always protected on goods on hand and unsold and purchased within 60 days of price decline.

Again, on November 1, 1920, Fitzgerald wrote defendants that goods returned would not be received to offset current account or obligations incurred on the basis of a straight sale, and that the matter of returning and crediting would be forwarded to the factory, and that the factory would write them giving its disposition of the matter. On November 9, 1920, plaintiff wrote defendants that it would not allow them to return their entire stock. On November 10, 1920, Fitzgerald wrote to defendants that the matter of returning the stock for credit was entirely with the credit department at Akron, and that defendants must not forget that he was limited to certain matters, such as selling goods, territorial arrangements, etc., but that when it came to credits, return of unsold merchandise, and things of that sort they were dealing with the credit department, because, "after we have made a sale of goods, then the matter passes out of our hands into those of the credit department at Akron, and we have no authority to take action on matters pertaining to their department."

Fitzgerald was evidently well disposed toward the wish of defendants to obtain favorable consideration for extensions which they had applied for; yet he conveyed no information from which they could have believed that he could go counter to the letters which forbade extensions or guaranties against price decline. As late as February, 1921, when defendants tried to have plaintiff accept Liberty Bonds at their face value, instead of their market value, Fitzgerald wrote to them that the factory would take the bonds only at their market value.

The District Court, in denying the motion for a directed verdict, stated that, in view of the fact that Fitzgerald testified that he had authority to make any contracts that he did make, the case should go to the jury. It is correct that on cross-examination Fitzgerald testified that for contracts which he did make he had authority. But, when that statement is considered with other portions of his evidence, it is clear that he referred to any agreement which he admitted having made. He explained that for the $6,500 credit transaction and the November, 1920 agreement to take back the tires he had special authority, which was necessary, but stated that without such authority his agency was limited merely to the "selling end." His testimony was positive that, except in the matter just referred to, he had no authority to make, and that he did not tell defendants that he could make, any agreement for rebates or cancellation of notes or return of tires.

Our conclusion is that the plaintiff's motion for a directed verdict should have been granted. It therefore follows that the judgment of the District Court must be reversed, and the cause remanded, with directions to grant a new trial.

### Supplemental Opinion.

[2] Upon consideration of the motion for rehearing we conclude that our judgment should be modified. This view is based upon the

ground that there was evidence tending to show as a fact that defendants below were entitled to a credit on what is termed the Cassidy transaction, which was had about September, 1921, and which should be separated from the note arrangement discussed in the opinion as had in December, 1920; also as to the item of an additional credit of $137.76 claimed by Munnell & Sherrill for rebate upon tires said to have been purchased after September 15, and on hand and unsold November 15, 1921. We believe that if the evidence, as it appears in the record before us, bearing upon those two items only, had been submitted to the jury, and verdict had been rendered solely upon those items, the verdict could be sustained.

The Cassidy agreement between Munnell & Sherrill and Fitzgerald was that, if Cassidy as a distributor would take Mohawk tires then held by Munnell & Sherrill, he (Fitzgerald), as agent for the Mohawk Company, would relieve Munnell & Sherrill of such stock as they might turn over to Cassidy. In accordance with this understanding Fitzgerald saw Cassidy, who agreed to take the tires, and upon September 17 Fitzgerald and Sherrill went over the stock and took a list of Mohawk tires which Munnell & Sherrill then had on hand, and on the 18th Fitzgerald gave Munnell & Sherrill written authority to turn over any tires or tubes in stock, that might be "agreeable" to Munnell & Sherrill and to Cassidy, to the American Tire & Rubber Company. Cassidy took tires to the value of $9,814.20. (Munnell & Sherrill appear to have been given credit for but $1,079.25.) Cassidy thereafter sold some of the tires, and shipped the balance to the Mohawk Company at San Francisco. Munnell & Sherrill wrote to the Mohawk factory, at Akron, Ohio, under date of September 21, to the effect that, on instructions from Fitzgerald, they had transferred practically all of their stock of Mohawk tires to the American Tire & Rubber Company and were sending the numbers to San Francisco, asking credit on their account. This letter also referred to a proposition, made to Fitzgerald, by which they would be enabled to continue Mohawk tires in conjunction with the American Tire & Rubber Company. Under date of September 26 the Mohawk Company wrote to Munnell & Sherrill, acknowledging their letter of the 21st, advising the company of the transfer of the stock in accordance with instructions from Fitzgerald. In this letter there is no disavowal of authority of Fitzgerald to make the arrangement for the transfer of the tires to Cassidy, nor any dissent from what Fitzgerald had done. The letter expresses regret over the change in representation, and refers to possible arrangements whereby Munnell & Sherrill could keep Mohawk tires for local sale, and states that the whole matter would have to be "handled" by Mr. Fitzgerald.

Re-examination of this letter compels the conclusion that it was in effect a ratification of the agreement that Fitzgerald had made and of the transfer of the tires to Cassidy. It was not until October 12 that the rubber company telegraphed to Munnell & Sherrill that it did not propose that the shipment should be thrown back on the hands of the company, and that it would be held subject to the risk of Munnell & Sherrill; that Munnell & Sherrill had authority only to turn over to Cassidy the stock he could use and retain. The company added that it

might use the stock at "60 per cent., but nothing less," and asked their disposition in the matter. To this Munnell & Sherrill replied in substance that they had shipped no tires, but had turned over all of their stock to the American Tire & Rubber Company as per the written instructions of Fitzgerald. Correspondence followed, wherein the Mohawk Company advised Munnell & Sherrill that they supposed that the stock turned over was such as could be used and sold at regular prices, and not in any unfit condition. But, inasmuch as the company had accepted the acts of Fitzgerald, the transaction must be tested with respect to Fitzgerald's arrangement, as evidenced by his letter authorizing the transfer.

This supplemental opinion is to be considered with the original opinion filed.

Reversed and remanded for a new trial.